# In the United States Court of Federal Claims
**OFFICE OF SPECIAL MASTERS**
No. 21-1606V

* * * * * * * * * * * * * * * * * * * * * * * * *

| | | |
|---|---|---|
| TAYLOR WILLIAMS, | * | Chief Special Master Corcoran |
| Petitioner, | * | Filed: March 12, 2025 |
| v. | * | |
| SECRETARY OF HEALTH AND HUMAN SERVICES, | * | |
| Respondent. | * | |

* * * * * * * * * * * * * * * * * * * * * * * * *

*Nancy R. Meyers*, Turning Point Litigation, Greensboro, NC, for Petitioner.

*Colleen C. Hartley*, U.S. Department of Justice, Washington, DC, for Respondent.

### DAMAGES DECISION[1]

On July 22, 2021, Taylor Williams filed a petition for compensation under the National Vaccine Injury Compensation Program (the "Vaccine Program").[2] Petition (ECF No. 1) at 1. Petitioner alleged the Table Claim that an influenza ("flu") vaccine she received on November 26, 2018, caused her to incur Guillain-Barré syndrome ("GBS"). *Id.* The matter was originally assigned to the Special Processing Unit (the "SPU"), but the parties could not resolve the claim. After the case was transferred out of SPU and to my individual docket, I determined Petitioner was entitled to damages. *See* Ruling on Entitlement, dated Apr. 29, 2024 (ECF No. 43) (the "Entitlement Ruling").

---

[1] Under Vaccine Rule 18(b), each party has fourteen (14) days within which to request redaction "of any information furnished by that party: (1) that is a trade secret or commercial or financial in substance and is privileged or confidential; or (2) that includes medical files or similar files, the disclosure of which would constitute a clearly unwarranted invasion of privacy." Vaccine Rule 18(b). Otherwise, the whole Decision will be available to the public in its present form. *Id.*

[2] The Vaccine Program comprises Part 2 of the National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3758, codified as amended at 42 U.S.C. §§ 300aa-10 through 34 (2012) [hereinafter "Vaccine Act" or "the Act"]. Individual section references hereafter will be to § 300aa of the Act (but will omit that statutory prefix).

The parties were also unable to resolve damages on their own, and have now briefed their respective positions. Petitioner's Damages Brief, dated Aug. 13, 2024 (ECF No. 51) ("Br."); Respondent's Brief on Damages, dated Oct. 22, 2024 (ECF No. 53) ("Opp."); Petitioner's Reply, dated Nov. 19, 2024 (ECF No. 54) ("Reply").

For the reasons set forth in greater detail below, **I find that Petitioner is entitled to an award of damages in the amount of $171,885.19**, representing $170,000.00 for actual pain and suffering, plus $1,885.19 in unreimbursed out-of-pocket expenses.

I.      **Brief Factual Summary**

A more complete summary of the relevant medical history and factual background is contained in the entitlement decision. *See generally* Entitlement Ruling at 2–4. I incorporate that history herein. In short, Petitioner successfully established entitlement to damages for a Table-GBS post-vaccination injury. *Id.* at 9.

On November 26, 2018, Petitioner (then 15-years-old), received the subject flu vaccine (as well as another vaccine not herein alleged as causal of injury). *Id.* at 2; Ex. 1 at 74, 79–80. A neurological exam performed at that time yielded normal results. Petitioner was taken to the WakeMed Raleigh emergency department on January 2, 2019, thirty-seven days post-vaccination, reporting numbness in her legs and fingers over the past two days and noting her previously diagnosed bronchitis and antibiotic course. Entitlement Ruling at 2; Ex. 2 at 768–70. An exam revealed lower extremity strength with diminished reflexes. *Id.*

Following admission for further neurologic evaluation, Petitioner underwent MRIs of her spine and brain—both of which were unremarkable—as well as a nerve conduction study that showed evidence of left tibial neuropathy with both axonal and demyelinating features. Ex. 2 at 799, 800. Petitioner's treating neurologist opined that her overall clinical picture was most consistent with GBS, although the clinical and testing results were not quite enough to confirm the diagnosis. Entitlement Ruling at 3. Petitioner subsequently received a course of IVIG. *Id.*; Ex. 2 at 814. Petitioner was discharged on January 8, 2019, to an inpatient rehabilitation facility with a diagnosis of GBS (although the nature of her presentation was not deemed consistent with the "classic" definition of GBS). Entitlement Ruling at 3; Ex. 2 at 798.

Petitioner completed inpatient rehabilitation and was discharged on January 24, 2019. Entitlement Ruling at 3; Ex. 2 at 152–53. Records indicate that following the completion of her inpatient rehab, Petitioner was able to participate in school sports, but at a much more limited capacity, and that she no longer experienced numbness or tingling in her lower extremities, and even displayed moderate to full strength in her bilateral lower extremities. *Id.* She further participated in eight outpatient physical therapy ("PT") sessions, through February 28, 2019, and

was deemed to have met her goals and discharged home with a home exercise program. Entitlement Ruling at 3; Ex. 3 at 11.

On March 20, 2019, Petitioner saw Dr. Traci Sheaffer, a pediatric neurologist. Ex. 4 at 2. A neurological examination was deemed normal, but for consistently absent deep tendon reflexes. Dr. Sheaffer advised Petitioner to continue working with a personal trainer on her deficits and to follow up for future neurologic treatment. Entitlement Ruling at 3; Ex. 4 at 2–5.

The records establish that Petitioner continued to seek additional medical treatment throughout the remainder of 2019, both for her post-GBS sequelae a well as for unrelated matters. Entitlement Ruling at 3; Ex. 4 at 7–10, 12–16, 21, 23, 28; Ex. 10 at 8–11. By October 2020, Petitioner was still reporting some motor deficits thought to be related to her GBS, but her headaches had improved—leading Dr. Sheaffer to propose additional PT for continued strength building.

## II.   Parties' Arguments

The parties agree that Petitioner is entitled to $1,885.19 for past unreimbursed medical expenses. Br. at 20–21; Opp. at 1 n.1. Thus, the only matter to be determined is the appropriate amount of a pain and suffering award.

*Petitioner*

Petitioner requests $225,000.00 in actual pain and suffering, emphasizing that she experienced a severe GBS injury which was "profoundly and uniquely impactful due to her young age." Br. at 11. Throughout the course of her hospitalization and subsequent treatment, Petitioner underwent an IVIG treatment; physical, occupational, and speech therapy; a lumbar puncture; an MRI of her spine and brain; and a nerve conduction study. *Id.*; Ex. 2 at 798, 825, 833, 851, 917. But despite this significant treatment course, she remained "severely below baseline" at the time of her discharge—including struggles with certain activities of daily living, difficulty with speech and swallowing, as well as limitations to her strength and range of motion. Br. at 11; Ex. 2 at 825, 833, 851, 881.

Although Petitioner acknowledges that by October 2019, her gait instability had essentially resolved when contrasted with her onset, she maintains that some of her GBS-related symptoms have persisted—noting that her legs do not respond the way they did prior to her GBS onset, she is more fatigued, and that she can only do a fraction of the physical activity she could prior to her GBS. Br. at 8. Moreover, Petitioner argues that her GBS "severely impacted" her emotional wellbeing, and that despite counseling she continues to struggle with "severe social anxiety" and

has even dropped out of college as a result. *Id.* at 8–9; Affidavit of Petitioner, dated July 11, 2024 (ECF No. 49-1) at ¶¶ 17–18, 26.

To support her proposed demand, Petitioner offers several cases she deems comparable to the instant case, where claimants received awards ranging from $180,000.00 to $200,000.00. *See, e.g.*, *Presley v. Sec'y of Health & Hum. Servs.*, No. 17-1888V, 2020 WL 1898856 (Fed. Cl. Spec. Mstr. Mar. 23, 2020) (awarding $180,000.00 in pain and suffering); *Hood v. Sec'y of Health & Hum. Servs.*, No. 16-1042V, 2021 WL 5755324 (Fed. Cl. Spec. Mstr. Oct. 19, 2021) (awarding $200,000.00 for past pain and suffering where petitioner was hospitalized for six days and completed two rounds of IVIG treatment, inpatient rehab, outpatient PT three times a week, but was unable to return to his position as a butcher); *Clemens v. Sec'y of health & Hum. Servs*, No. 19-1547V, 2022 WL 2288515 (Fed. Cl. Spec. Mstr. May 17, 2022) (awarding $180,000.00 in pain and suffering where petitioner was hospitalized for six days and required treatment that included one course of IVIG treatment; inpatient and outpatient PT, OT, and speech therapy; an x-ray, EKG, EMG, MRI, and a lumbar puncture).

Petitioner emphasizes the similarities between her own experience and that of the *Clemens* and *Hood* petitioners—noting their approximate one-week hospital stay, receipt of IVIG treatment, participation in PT, OT, and speech therapy (both in an inpatient and outpatient setting for Petitioner in the instant matter), and that all underwent extensive testing (i.e., MRI, EMG, and lumbar puncture (although the *Hood* petitioner only underwent an EMG)). However, she contends that additional factors warrant a higher pain and suffering award in this case than what was awarded in the aforementioned cases. Specifically, Petitioner notes the importance of consideration of a claimant's emotional well-being when awarding pain and suffering. Here, Petitioner's GBS had a significant impact on her, given her young age at the time of onset and the lasting mental effects of her GBS, which caused her to struggle anxiety and depression. Br. at 20. Thus, Petitioner maintains an award of $225,000.00 in pain and suffering is appropriate and reasonable based on the facts and circumstances herein. *Id.* at 17.

*Respondent*

Respondent argues for a lesser award of $100,000.00. Opp. at 18. In support, Respondent emphasizes Petitioner's overall limited treatment, which included a six-day hospital stay, a round of IVIG treatments, 16 days inpatient rehab, and eight outpatient therapy sessions. *See* Ex. 2 at 152–53, 798; Ex. 3 at 11. He further notes that at the time of her discharge from inpatient rehab, Petitioner reported no numbness or tingling in her lower extremities and exhibited 4/5 strength in her bilateral lower extremities. Opp. at 18; Ex. 2 at 152–53. Moreover, records indicate that at three months post-vaccination, Petitioner returned to volleyball practice, was participating in tournaments, and felt approximately 80% better. Opp. at 18; Ex. 3 at 11.

4

While Respondent acknowledges that Petitioner underwent 14 medical evaluations for headaches/migraines, fevers, and/or leg pain between May 2019 and March 2023—treatments which Petitioner considers sequela of her GBS—these encounters were focused upon unrelated ailments. Opp. at 18. Similarly, Respondent notes that not only has Petitioner not provided any records memorializing visits for mental health counseling, but that her pre-vaccination medical history reflects a history of anxiety. *Id.*; Br. at 8; Ex. 13 at 3; Ex. 1 at 61. Respondent thus argues that Petitioner experienced a relatively mild course of GBS without significant sequela. Opp. at 18.

To support his preferred award sum, Respondent cites *Granville* and *Koonce*, which involved awards of $92,500.00 and $70,000.00, respectively. *See Granville v. Sec'y of Health & Hum. Servs.*, No. 21-2098V, 2023 WL 6441388 (Fed. Cl. Spec. Mstr. Aug. 30, 2023); *Koonce v. Sec'y of Health & Hum. Servs.*, No. 21-1560V, 2024 WL 3567368 (Fed. Cl. Spec. Mstr. July 8, 2024). In *Granville*, the petitioner alleged a GBS injury following receipt of a flu vaccine leading to a five-day hospitalization, five IVIG treatments, a lumbar puncture, and minimal outpatient treatment. *Granville*, 2023 WL 6441388, at *4. Although the *Granville* petitioner missed almost two weeks of work, she still achieved a relatively quick and full recovery. *Id.* Similarly, the *Koonce* petitioner required a four-day hospitalization and received four IVIG treatments, 2023 WL 3567368, at *3–4. And that petitioner reported ongoing numbness from his feet to his knees approximately two years post-vaccination, yet such numbness "did not interfere with [petitioner's] physical activities such as playing racquetball." *Id.* at *4. Based on the facts herein and relying on the above-mentioned comparable cases, Respondent argues that an award of $100,000.00 in pain and suffering is reasonable and appropriate. Opp. at 20.

### III. Relevant Law on Damages Determinations

#### A. *General Considerations*

A petitioner may recover "actual unreimbursable expenses incurred before the date of judgment awarding such expenses which (i) resulted from the vaccine-related injury for which the petitioner seeks compensation, (ii) were incurred by or on behalf of the person who suffered such injury, and (iii) were for diagnosis, medical or other remedial care, rehabilitation . . . determined to be reasonably necessary." Section 15(a)(1)(A)(i)–(iii). The petitioner bears the burden of proof with respect to each element of compensation requested. *Brewer v. Sec'y of Health & Hum. Servs.*, No. 93-0092V, 1996 Wl 147722, at *22–23 (Fed. Cl. Spec. Mstr. Mar. 18, 1996).

#### B. *Pain and Suffering*

Compensation awarded pursuant to the Vaccine Act shall include "[f]or actual and projected pain and suffering and emotional distress from the vaccine-related injury, and award not

5

to exceed $250,000.000." Section 15(a)(4). There is no mathematic formula for assigning a monetary value to a person's pain and suffering and emotional distress. *I.D. v. Sec'y of Health & Hum. Servs.*, No. 04-1593V, 2013 WL 2448125, at *9 (Fed. Cl. Spec. Mstr. May 14, 2013) ("[a]wards for emotional distress are inherently subjective and cannot be determined by using a mathematical formula"); *Stansfield v. Sec'y of Health & Hum. Servs.*, No. 93-0172V, 1996 WL 300594, at *3 (Fed. Cl. Spec. Mstr. May 22, 1996 ("the assessment of pain and suffering is inherently a subjective evaluation").

Factors to be considered when determining an award for pain and suffering include: 1) awareness of the injury; 2) severity of the injury; and 3) duration of the suffering. *I.D.*, 2013 WL 2448125, at *9 (citing *McAllister v. Sec'y of Health & Hum. Servs.*, No. 91-1037V, 1993 WL 777030, at *3 (Fed. Cl. Spec. Mstr. Mar. 26, 1993), *vacated and remanded on other grounds*, 70 F.3d 1240 (Fed. Cir. 1995)). I may also consider prior pain and suffering awards to aid my resolution of the appropriate amount of compensation for pain and suffering in this case. *See, e.g.*, *Doe 34 v. Sec'y of Health & Hum. Servs.*, 87 Fed. Cl. 758, 768 (2009) (finding that "there is nothing improper in the chief special master's decision to refer to damages for pain and suffering awarded in other cases as an aid in determining the proper amount of damages in this case."). And of course, I may rely on my own experienced adjudicating similar claims. *Hodges v. Sec'y of Health & Hum. Servs.*, 9 F.3d 958, 961 (Fed. Cir. 1993) (noting that Congress contemplated that the special masters would use their accumulated expertise in the field of vaccine injuries to judge the merits of individual claims.

Although pain and suffering in the past was often determined based on a continuum, as Respondent argues, that practice was cast into doubt by a decision from several years ago. *Graves v. Sec'y of Health & Hum. Servs.*, 109 Fed. Cl. 579 (Fed. Cl. 2013). *Graves* maintained that to do so resulted in "the forcing of all suffering awards into a global comparative scale in which the individual petitioner's suffering is compared to the most extreme cases and reduced accordingly." *Id.* at 590. Instead, *Graves* assessed pain and suffering by looking to the record evidence, prior pain and suffering awards within the Vaccine Program, and a survey of similar injury claims outside of the Vaccine Program. *Id.* at 595. Under this alternative approach, the statutory cap merely cuts off *higher* pain and suffering awards—it does not shrink the magnitude of *all* possible awards as falling within a spectrum that ends at the cap. Although *Graves* is not controlling of the outcome in this case, it provides reasoned guidance in calculating pain and suffering awards.

### C.  *Pain and Suffering in GBS Cases*

Because Table claims alleging GBS after receipt of the flu vaccine are common in the SPU, I include herein some discussion of the kinds of pain and suffering awards obtained in such cases. As of July 1, 2024, on nearly every occasion that SPU has had to resolve the appropriate award for GBS pain and suffering (49 cases), over $100,000.00 has been awarded in every case but one (and

there only the slightly lesser sum of $92,500.00 was awarded). The first-quartile value is $155,000.00, the median is $165,000.00, the third-quartile value is $178,000.00, and the largest award was $192,500.00. *Holmberg v. Sec'y of Health & Hum. Servs.*, No. 21-1132V, 2024 WL 4607929, at *3–5 (Fed. Cl. Spec. Mstr. Oct. 7, 2024).

A consistent starting consideration in reaching these determinations is that "GBS pain and suffering awards generally should be higher than those awarded to petitioners who have suffered a less frightening and physically alarming injury, such as SIRVA."[3] *Gross v. Sec'y of Health & Hum. Servs.*, No. 19-0835V, 2021 WL 2666685, at *5 (Fed. Cl. Spec. Mstr. Mar. 11, 2021); *see also Castellanos v. Sec'y of Health & Hum. Servs.*, No. 19-1710V, 2022 WL 1482497, at *10 (Fed. Cl. Spec. Mstr. Mar. 30, 2022) (emphasizing recognition of "the seriousness of GBS as a general matter," in awarding a six-figure sum); *Voeller v. Sec'y of Health & Hum. Servs.*, No. 20-1526V, 2023 WL 5019830, at *10 (Fed. Cl. Spec. Mstr. July 6, 2023) (noting GBS's "frightening" nature).

But of course, not every GBS case is equally severe. Further details of the initial medical course are considered—including any mistake or delay in diagnosing GBS; any in-patient hospitalization and/or in-patient rehabilitation (and the duration of any such stays); diagnostic procedures (e.g., bloodwork, lumbar punctures, electrodiagnostic studies, imaging); the severity of symptoms at their nadir (e.g., involving incontinence or respiratory failure); the extent and effectiveness of treatment (e.g., IVIg plasmapheresis, pain medications); other interventions (e.g., feeding tubes, breathing tubes, catheterization); and any complications (e.g., sepsis during hospitalization).

Also relevant is a petitioner's long-term course—as evidenced by out-patient therapies, neurology evaluations, and other medical appointments concerning GBS; the results of repeat electrodiagnostic studies and other relevant tests; medical providers' assessments of the degree of recovery achieved; ongoing reliance on assistive devices and medications; and relevant treatment gaps. Previous opinions have recognized that "a substantial recovery does not mean that [an individual] has fully recovered from his GBS and has no ongoing sequelae. It is common for petitioners to experience ongoing symptoms of GBS, such as numbness and fatigue, even with a good recovery." *Elenteny v. Sec'y of Health & Hum. Servs.*, No. 19-1972V, 2023 WL 2447498, at *5 (Fed. Cl. Spec. Mstr. Mar. 10, 2023). But symptoms of that nature are typically folded into a "typical" past pain and suffering award, and will not justify a future component. *See, e.g.*, *id*; *Miller v. Sec'y of Health & Hum. Servs.*, No. 21-1559V, 2023 WL 2474322, at *8 (Fed. Cl. Spec. Mstr. Feb. 10, 2023).

"The mere fact that a claimant had pre-vaccination comorbidities does not *per se* diminish the impact of [the vaccine injury] on his life—especially one as alarming and potentially life-altering as GBS—and therefore is not alone reason for a lower award." *Bircheat v. Sec'y of Health*

---

[3] Should injury related to vaccine administration ("SIRVA") is another Table injury. 42 C.F.R. §§ 100.3(a), (c)(10).

7

*& Hum. Servs.*, No. 19-1088V, 2021 WL 3026880, at *4 (Fed. Cl. Spec. Mstr. June 16, 2021). However, a special master is statutorily required to consider to what extent a petitioner's pain and suffering is truly "*from* the vaccine-related injury," Section 15(a)(4) (emphasis added), and nor from any unrelated preexisting or subsequently-developed medical issues. *See, e.g.*, *Bircheat*, 2021 WL 3026880, at *4; *Gross*, 2021 WL 2666685, at *5.

Also worthy of consideration are the injury's impact on a petitioner's personal circumstances including his or her family and other personal obligations, and professional life (whether or not lost wages are directly claimed). All of these facts are primarily gleaned from the medical records—although sworn statements and/or other evidence may also be considered, especially if they *supplement*, and do not contradict, the facts reflected in the medical records.

## ANALYSIS

In this case, awareness of the injury is not disputed. Although not yet an adult, the record reflects that at all times Petitioner was a competent teenager with no mental impairments that would impact her awareness of her injury. Therefore, I analyze principally the severity and duration of Petitioner's injury. In performing this analysis, I have reviewed the record as a whole, including the medical records, affidavits, and all assertions made by the parties in written documents. I have also considered prior awards for pain and suffering issued in comparable cases, although I ultimately base my determination on the circumstances of *this* case.

Here, Petitioner's medical records and affidavits provide a substantive overview of her GBS injury, with a moderately-severe acute phase requiring an emergency department visit within approximately one month of vaccination; a six-day hospitalization; extensive PT (both inpatient and outpatient), OT (inpatient and outpatient), and speech therapy; invasive testing including a nerve conduction study, MRIs of her brain and spine, an unsuccessful lumbar puncture; and IVIG treatment. Petitioner showed and reported *some* improvement after her initial treatment course. *See* Ex. 2 at 798. However, the suffering Petitioner suffered during the acute phase of her GBS illness was certainly exacerbated by some of the more unusual symptoms she experienced—including becoming "intermittently hypertensive," "develop[ing] slight chewing difficulty and facial muscle involvement," and requiring a peripheral IV." *Id.* at 798, 804.

The record further demonstrates that following her discharge from outpatient PT and to her home exercise program and personal trainer on February 28, 2019, Petitioner continued to "work on building [her] endurance," and reported feeling "80% better overall" despite her jumping ability remaining only "55-60% improved." Ex. 3 at 11. Thereafter, between October 2019 and November 2022, Petitioner had multiple visits with various providers regarding her gait, feelings of fatigue, and lower extremity weakness. *See, e.g.*, Ex. 6 at 29, 30 (noting Petitioner's "gait instability had not resolved since her GBS episode" during 10/23/2019 visit with Tida Lam, D.O.); Ex. 4 at 7

(documenting visit with Dr. Scheaffer on 11/20/2019 and noting Petitioner's complaints that her "legs do [not] feels the same as before" and it is "as if she is 'relearning how to walk'"), 33 (reporting that her legs do not respond as they did prior to vaccination during 10/30/2022 visit); Ex. 12 at 15 (complaining of "throbbing pain" in legs at 11/7/2022 visit). Nevertheless, the record establishes that Petitioner's recovery was largely good, and with no truly permanent deficits—albeit characterized by the kinds of post-injury sequelae common to GBS patients.

I also give weight to circumstances particular to Petitioner's case, such as the negative effect of her GBS illness on her academic and athletic career and aspirations. Here, Petitioner was 15-years-old at the time of vaccination, a sophomore in high school, and an avid volleyball player—participating on both her school and club teams. And the record demonstrates that prior to her illness, Petitioner was a talented student and volleyball player. Affidavit of Allison Williams, dated July 11, 2024 (ECF No. 49-2) ("Mother Aff.") at ¶¶ 4, 13. However, the record further supports that Petitioner's academic and athletic success was impacted by her GBS illness, as she not only missed "a majority of her spring semester" of her sophomore year, but she was unable to return to play on her school's volleyball and track and field teams—participating only on her club team but in a very limited capacity. *Id.* at ¶ 14. Furthermore, Petitioner was granted several accommodations and exempt for exams upon her return to class.

Based upon the forgoing, and considering the parties' written arguments, I find that Petitioner suffered a moderate GBS injury—although as a class, GBS injuries are distinguishable from many other kinds of common Program vaccine injuries. *Gross*, 2021 WL 2666685, at *5. Under such circumstances, an award higher than what Respondent proposes is appropriate—but also lower than what Petitioner requests. I would generally award pain and suffering in excess of $200,000.00 in a GBS case *only* where it had been shown that the claimant was left with a permanent and life-altering physical deficit that could not be effectively treated, leaving the individual only palliative care options. *Kresl v. Sec'y of Health & Hum. Servs.*, No. 22-0518V, 2024 WL 1931498, *4 (Fed. Cl. Spec. Mstr. Apr. 1, 2024) (stating that "I *may* approach or surpass an award of $200,000.00 for GBS pain and suffering in future cases [where] compelling facts particularly of severe GBS residual effects" exists). In addition, other than the Petitioner's age (which I do give some weight to in my determination), this case does not present the kind of special factors—like impact on a claimant's ability to work at their favored employment position—that have resulted in awards in the $180,000.00 range. *See Dillenbeck v. Sec'y of Health & Hum. Servs.*, No. 17-428V, 2019 WL 4072069, at *14 (Fed. Cl. Spec. Mstr. July 29, 2019). Petitioner has some post-injury sequelae, but it cannot be concluded from the record that they will be permanent in her life.

Here, an award somewhat below $180,000.00 is most appropriate. I find two cases not referenced by either side particularly instructive. *See Weidner v. Sec'y of Health & Hum. Servs.*, No. 21-1554V, 2023 WL 8110729 (Fed. Cl. Spec. Mstr. Oct. 13, 2023) (awarding $163,000.00 for

pain and suffering); *Maxwell* v. *Sec'y of Health & Hum. Servs.*, No. 21-1877V, 2024 WL 1343007 (Fed. Cl. Spec. Mstr. Feb. 27, 2024) (awarding $140,000.00 for pain and suffering).

In *Weidner*, the petitioner was 19-years-old, working as a nursing assistance/aide, and had a one-year-old child at the time of vaccination. 2023 WL 8110729, at *1. She similarly presented to an ER within one month of vaccination, remained in the hospital for six-days, underwent multiple diagnostic procedures (i.e., MRIs, an EMG, CT, lumbar puncture, and one five-day course of IVIG), as well as participated in in-home PT/OT. *Id.* at *4. Approximately two months after her hospital discharge, the *Weidner* petitioner exhibited normal strength and DTRs—although I found her assertions of continued ongoing sequelae of GBS, such as numbness and tingling throughout her body, to be credible. *Id.* Here, I acknowledge that Petitioner was not a mother to a one-year-old child at the time of vaccination, nor was she working in the same capacity as the *Weidner* petitioner. However, both petitioners were young and in school (high school and nursing school) at the time, had to take leave from school (including work for the *Weidner* petitioner) because of their injury, and they returned to their academic and professional obligations in a more limited capacity as they were unable to perform their duties as they did prior to receipt of their subject vaccines.[4]

*Maxwell* involved a 17-year-old high school student who dreamed of playing lacrosse at a collegiate level and becoming a Navy Seal. 2024 WL 1343007, at *2. The petitioner was hospitalized for nine days, during which time he received a five-day course of IVIG and required PT, OT, and speech therapy. *Id.* at *4. He was subsequently transferred to an inpatient rehab facility for seven days and then completed three outpatient PT sessions before being "cleared for 'a gradual return to his sport.'" *Id.* The *Maxwell* petitioner returned to school approximately two and a half months post-vaccination, albeit pursuant to an individual accommodation plan. *Id.* However, I "recognize[d] that any heightened difficulty or complete loss of an opportunity is disappointing" and noting further that "the timing of Petitioner's GBS illness, during his crucial junior year of high school, no doubt caused him additional anguish and frustration." *Id.*

Accordingly, I find an award above *Weidner* appropriate, to account for Petitioner's personal considerations and the toll such a frightening injury had upon her. I therefore award $170,000.00 in actual pain and suffering.

## CONCLUSION

Based on the record as a whole and arguments of the parties, I award Petitioner a lump sum payment of **$171,885.19** (representing $170,000.00 for Petitioner's past pain and suffering, and

---

[4] I note, however, that the *Weidner* petitioner was able to return to work within a few months of onset, whereas, here, Petitioner's affidavit demonstrates that she had to miss a majority of her spring semester before returning to class.

10

$1,885.19 for past unreimbursed medical expenses), to be paid through an ACH deposit to Petitioner's counsel's IOLTA account for prompt disbursement. This amount represents compensation for all damages that would be available under 42 U.S.C. § 300aa-15(a).

In the absence of a motion for review filed pursuant to RCFC Appendix B, the Clerk of the Court **SHALL ENTER JUDGMENT** in accordance with the terms of this Decision.[5]

**IT IS SO ORDERED.**

/s/ Brian H. Corcoran  
Brian H. Corcoran  
Chief Special Master

---

[5] Pursuant to Vaccine Rule 11(a), the parties may expedite entry of judgment if (jointly or separately) they file notices renouncing their right to seek review.